IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JEANNE MCCALLAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:22-cv-133-ECM |
| | ) | [WO] |
| CARLY B. WILKINS, | ) | |
| as Chapter 7 Trustee, | ) | |
| | ) | |
| Appellee. | ) | |

**MEMORANDUM OPINION AND ORDER**

This appeal concerns a number of financial transactions involving Appellant Jeanne McCallan ("Jeanne"). In an adversary proceeding, the bankruptcy court determined that Jeanne was the recipient of more than one hundred fraudulent transactions. The bankruptcy judge made this finding after denying Jeanne's motion for recusal. This appeal followed.

**I. JURISDICTION**

The bankruptcy court has appellate jurisdiction over this bankruptcy appeal pursuant to 28 U.S.C. § 158.

**II. STANDARD OF REVIEW**

In an appeal of a bankruptcy court decision, the district court sits as an appellate court. *In re Williams*, 216 F.3d 1295, 1296 (11th Cir. 2000) (per curiam). The district court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and conclusions of law under the *de novo* standard. *In re Piazza*, 719 F.3d 1253, 1260 (11th Cir. 2013).

1

## III. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts of this case are extensive and largely undisputed.  This appeal results from an adversary proceeding against Jeanne in underlying bankruptcy proceedings involving her husband Timothy McCallan ("McCallan").  As a result of former judicial proceedings, McCallan was subject to a judgment in excess of $100,000,000.  In the bankruptcy court, Appellee Carly Wilkins ("Wilkins"), as bankruptcy trustee, avoided a number of conveyances Jeanne received from non-party entities on the theory that those conveyances were fraudulent transfers.

Wilkins avoided more than one hundred conveyances Jeanne received from non-party entities Intermark Communications, Inc. ("Intermark"); The Achievable, Inc. ("The Achievable"); Vortex Debt Group ("Vortex"); Clear Blue Debt Solutions ("Clear Blue"); WAV Team, Inc. ("WAV Team"); Hello Performance; Birdman, LLC ("Birdman"); Alpha Mar Group ("Alpha Mar"); Island Punch Beverage, LLC ("Island Punch"); and Island Vibes Worldwide Tours, LLC ("Island Vibes").  McCallan owned 100% interest in Intermark, The Achievable, Vortex, Clear Blue, and WAV Team.  He also owned 100% of Hello Performance before he transferred his ownership interest to Jeanne on May 21, 2012.  McCallan was also the grantor and manager of a trust that owned 95% of Birdman.  Jeanne owned the remaining 5% of Birdman.  McCallan did not have similar ownership interests in Alpha Mar, Island Punch, or Island Vibes.

Wilkins filed a number of exhibits in support of her fraudulent transfer allegations.  The bankruptcy court's scheduling order set July 6, 2021 as the deadline for submitting such exhibits.  Although Wilkins submitted many of her exhibits in a timely manner, she

filed forty exhibits a day late on July 7, 2021.  Wilkins explained that those forty documents were submitted late due to internet issues.  The bankruptcy judge allowed the untimely exhibits into evidence and relied on them in its findings.

Jeanne was originally represented in these proceedings by attorneys Scott Widerman ("Widerman") and Michael Fritz ("Fritz").  On July 15, 2021—before the proceeding went to trial—Fritz emailed an apparent suicide letter to numerous members of the legal profession.  The email insulted multiple individuals in the legal community and blamed them for Fritz's decision to end his own life.  Wilkins, the presiding bankruptcy judge, and the district's other bankruptcy judge were amongst the individuals named in Fritz's email.  While Fritz did not take his own life, he took no further part in Jeanne's adversary proceedings after sending the email.

Attorney Orin Odom ("Odom") filed a notice of appearance on Jeanne's behalf on July 21, 2021.  On August 31, 2021, Odom filed a motion for recusal of the presiding bankruptcy judge.  Jeanne argued that, due to the offensive comments in Fritz's email about the presiding bankruptcy judge, the judge could not preside over the litigation impartially. In support of the motion, Widerman filed an unredacted, unsealed copy of Fritz's email.

The bankruptcy judge denied the motion to recuse and imposed sanctions against Widerman for filing the email publicly and without redaction.  The bankruptcy judge also revoked Widerman's pro hac vice admission status, although he delayed that revocation to allow Widerman to represent Jeanne at trial.  Nevertheless, Widerman declined to further participate in the proceedings.  Widerman then filed a motion to withdraw as counsel, which the bankruptcy judge denied.  On learning that he would need to take Widerman's

place as first chair attorney at trial, Odom filed a motion to continue the trial. The bankruptcy judge also denied that motion.

The entities that Wilkins claimed made the fraudulent conveyances were not named as defendants to the adversary proceedings. However, after a bench trial, the bankruptcy court determined that these entities—many of which were wholly owned by McCallan—were McCallan's alter egos. Thus, the bankruptcy court determined that the transfers were made by McCallan. In its memorandum opinion, the bankruptcy court found that the transfers constituted both actual and constructive fraud. The bankruptcy court relatedly found that the transfers were made with intent to hinder, delay, or defraud creditors; McCallan was insolvent when he made the transfers; and Jeanne did not provide reasonably equivalent value for any of the transfers.

The avoided transfers were cumulatively worth $5,607,679.06. Much of the evidence at trial came from Wilkins' expert witness Wayne Allen Carroll ("Carroll") and Jeanne's expert witness Kellie Eckstein ("Eckstein"). Carroll and Eckstein testified on a number matters the bankruptcy court considered in its findings, such as the nature of the conveyances in question and the organization of the non-party entities. The bankruptcy court used Carroll's testimony that the non-party entities disregarded corporate formalities to support its determination that the non-party entities were McCallan's alter egos. Carroll testified that the non-party entities disregarded corporate formalities in the way they made distributions, freely transferred funds amongst one another, and made payments to satisfy McCallan's personal obligations.

The court also considered Carroll's testimony in its fraudulent transfer analysis. On

the issue of actual fraud, Carroll testified that McCallan had a history of concealing assets. For example, McCallan used Hello Performance to purchase and sell gold without reporting those transactions on his taxes. Carroll also provided testimony relevant to the constructive fraud inquiry. Using a balance sheet test, Carroll calculated that McCallan was insolvent as early as 2007. Carroll weighed McCallan's liabilities—primely the judgment against McCallan—with McCallan's assets. Carroll determined that McCallan's assets were significantly lower than his liabilities. Carroll also testified that he did not find evidence that Jeanne gave consideration for the conveyances she received.

Two appeals resulted from the bankruptcy court proceedings. First, Widerman appealed the sanctions imposed against him. In a separate opinion, this Court vacated those sanctions. Now, Jeanne appeals the bankruptcy court's ultimate conclusion that the transactions at issue were fraudulent conveyances. Jeanne argues that she did not receive an impartial trial, the non-party entities were denied their due process rights, and the bankruptcy court erred in its findings.

## IV. DISCUSSION

Jeanne raises four issues on appeal. First, she argues that she was highly prejudiced by the bankruptcy judge's actions and rulings on issues involving Widerman. Second, she argues that the bankruptcy court's proceedings violated non-party entities' due process rights. Third, she argues that the bankruptcy court improperly found that those non-party entities made fraudulent conveyances to Jeanne. Finally, she argues that the bankruptcy court improperly admitted certain trustee exhibits. Jeanne requests reversal of the bankruptcy court's findings and a new trial on all relevant issues. For the reasons that

follow, the Court determines that the bankruptcy court is due to be affirmed in part and vacated in part.

## A. Motion to Recuse

Jeanne argues that the bankruptcy judge was not impartial in his rulings on pretrial matters. For instance, Jeanne argues that the bankruptcy judge denied her access to proper representation by revoking Widerman's pro hac vice admission, denying Widerman's motion to withdraw, and denying Odom's motion to continue the trial. As a whole, Jeanne argues that the bankruptcy judge abused his discretion by denying Jeanne's motion to recuse.

"We review a judge's decision to recuse for abuse of discretion." *Murray v. Scott*, 253 F.3d 1308, 1310 (11th Cir. 2001). "If a party could force recusal of a judge by factual allegations, the result would be a virtual 'open season' for recusal." *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986) (quoting *Phillips v. Joint Legis. Comm.*, 637 F.2d 1014 (5th Cir. 1981)). "[A] judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation. If this occurred the price of maintaining the purity of the appearance of justice would be the power of litigants or third parties to exercise a veto over the assignment of judges." *Id.* "Judges must not recuse themselves for imaginary reasons; judge shopping should not be encouraged." *Murray*, 253 F.3d at 1313. "Requiring recusal for all disruptive, recalcitrant and disagreeable commentary would undermine the judiciary." *In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1279 (11th Cir. 2009).

Here, the bankruptcy judge did not abuse his discretion by denying the motion to recuse. In his memorandum opinion, the bankruptcy judge expressed concern that granting

the motion to recuse would allow a lawyer to "insult a judge and his colleague in vile and obscene terms and then insist that the judge recuse because he would not be seen as unbiased after such a vicious attac[k]." (Doc. 2-78 at 12). The bankruptcy judge reasoned that allowing such an outcome would grant a litigant a veto power over her judge, which would be contrary to the ruling in *Greenough*.

This Court agrees. Fritz was removed from the case and was not involved in the motion to recuse or any subsequent pretrial motions. The record does not reflect that Fritz's conduct could be attributed to Jeanne or her remaining lawyers. The insults in Fritz's email were personal and cannot reasonably be imputed to Jeanne, Widerman, or Odom. Thus, there is no indication that the bankruptcy judge would have been prejudiced against Jeanne or her representation after Fritz was removed from the case. On a broader scale, requiring recusal in such a situation would provide attorneys the ability to force recusal and give parties the ultimate veto power over their judge.

The Court would also note that any "prejudice" Jeanne experienced was created by Widerman. The bankruptcy judge delayed the revocation of Widerman's license until the end of trial, giving him the opportunity to fully participate in the proceedings. Widerman chose not to do so. Thus, Widerman, not the bankruptcy judge, "forced" Odom to take over as first chair attorney. The bankruptcy judge did not abuse his discretion in denying the motion to recuse, and the ruling on that motion is due to be affirmed.

### B. Alter Ego Theory

Jeanne next argues that, because the non-party entities were not named defendants in the adversary proceeding, their due process rights were violated when the bankruptcy court

avoided conveyances they made to Jeanne.  However, Jeanne admits that the entities need not be named parties if they were McCallan's "alter-egos."  Thus, Jeanne argues that the bankruptcy court erred in determining that the non-party entities were McCallan's alter-egos.

The Court reviews the bankruptcy court's findings of fact on the alter-ego issue under a clearly erroneous standard of review; however, the Court reviews the bankruptcy court's application of the law to those facts *de novo*. *United States v. Fid. Cap. Corp.*, 920 F.2d 827, 836 (11th Cir. 1991).  An alter-ego theory requires a finding that "(1) the shareholder dominated and controlled the corporation to such an extent that the corporation did not have its own independent existence, (2) the corporate form must have been used fraudulently or improperly, [and] (3) the fraudulent or improper use of the corporate form must have caused the injury to the claimant." *In re 331 Partners, LLC*, 2010 WL 4676621, at *7 (Bankr. S.D. Ala. Nov. 9, 2010).  An entity may be a shareholder's alter ego "'where a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where corporate and personal funds are intermingled and corporate funds are used for personal purposes, or where an individual drains funds from the corporation.'" *In re Coala, Inc.*, 182 B.R. 887, 895 (Bankr. N.D. Ala. May 24, 1995) (quoting *Backus v. Watson*, 619 So.2d 1342, 1345 (Ala. 1993)).

Here, evidence established that McCallan wholly owned Intermark, The Achievable, Vortex, Clear Blue, and WAV Team.  McCallan also wholly owned Hello Performance

before he transferred ownership to Jeanne on May 21, 2012. Through an intermediary trust, McCallan owned 95% of Birdman while Jeanne owned the remaining 5%. Thus, there was sufficient evidence that McCallan dominated and controlled Intermark, The Achievable, Vortex, Clear Blue, WAV Team, Hello Performance, and Birdman.

However, the record does not establish that McCallan dominated and controlled Alpha Mar, Island Punch Beverage, or Island Vibes Worldwide Tours. McCallan did not own Alpha Mar. McCallan performed consulting work for Alpha Mar and directed that his fees be paid to Jeanne. The record suggests that McCallan had similar payment agreements with Island Vibes and Island Punch. The record does not suggest that McCallan had a dominant ownership interest in either of those companies.

Here, the bankruptcy court found that McCallan's wholly owned non-party entities improperly used the corporate form such that they were his alter egos. In attacking the bankruptcy court's ruling, Jeanne suggests that Wilkins had to prove all of the *Coala* factors. However, presence of all of the *Coala* factors is not necessary to find that an entity was a shareholder's alter ego. *See Backus*, 619 So.2d at 1346 (recognizing alter ego finding could be affirmed when not all factors weighed in favor of that finding). Here, there was sufficient evidence that McCallan's wholly owned entities did not observe the corporate form, personal and corporate funds were intermingled between those entities, and those transfers drained funds from those entities.

In total, 7.8 million dollars flowed between McCallan's wholly owned non-party entities. The circumstances behind these transfers suggest that those entities did not respect the corporate form. Intermark directly paid the McCallans' mortgage, which Carroll

testified was improper.  Intermark and Achievable distributed money to Jeanne in years they were experiencing a loss.  Vortex, WAV Team, and Clear Blue all transferred money to Jeanne when they were inactive entities.  Birdman's distributions to Jeanne came directly from a trust that was organized and funded by McCallan.  Hello Performance was improperly transferred to Jeanne, and the funds from McCallan's sale of gold coins were improperly transferred to Hello Performance.  The court considered these facts, amongst others, to determine that McCallan treated the capital of these entities as his own in disregard of the corporate form.

Thus, there was sufficient evidence that Intermark, The Achievable, Vortex, Clear Blue, WAV Team, Hello Performance, and Birdman were McCallan's alter egos.  Thus, those entities' due process rights were not violated when the bankruptcy court avoided their conveyances as fraudulent transfers.[1]  However, there was insufficient evidence to find that McCallan dominated and controlled Alpha Mar, Island Punch, or Island Vibes such that they were his alter egos.  Thus, the bankruptcy court's findings on that matter are due to be vacated.  On remand, the bankruptcy court should conduct the fraudulent transfer analysis in light of this opinion.

### C.  Fraudulent Transfers

Jeanne next argues that the bankruptcy court erred in finding that the conveyances she received were fraudulent transfers.  The trustee may avoid transfers of a debtor's interest in property when those transfers amount to actual or constructive fraud.  *See* 11 U.S.C. § 548(a).

---

[1] Further, an alter ego theory may not have been necessary to protect the non-party entities' due process rights. Wilkins did not seek relief from any of the non-party entities. *See In re Fin. Federated Title & Tr., Inc.*, 252 B.R. 840, 843 (Bankr. S.D. Fla. 2000).  Jeanne does not establish that any of the non-party entities' rights, interests, or liabilities were affected by the bankruptcy court's proceedings. *Id.*

A trustee can avoid a transfer as actual fraud by proving "(1) a transfer (2) of an interest of the debtor in property (3) that occurred within two years prior to the filing of the petition, (4) where the debtor made the transfer with 'actual intent to hinder, delay, or defraud' one of its creditors. *In re Vista Bella, Inc.*, 511 B.R. 163, 194 (Bankr. S.D. Ala. May 2, 2014). The trustee may avoid transfers as constructive fraud by showing that "the Debtor received less than a reasonably equivalent value in exchange for the transfer and (2) the Debtor was insolvent on the date of the transfer" in place of showing actual intent to hinder, delay, or defraud. *Id.*

Jeanne does not challenge whether the transfers were made or whether they occurred within the relevant timeframe. However, Jeanne argues that the transfers were not McCallan's interest in property. As the bankruptcy court properly found that the non-party entities were McCallan's alter egos,[2] the transfers were interests in McCallan's property. On the issue of actual fraud, Jeanne challenges whether McCallan had actual intent to hinder, delay, or defraud. As to the constructive fraud claims, Jeanne challenges whether McCallan received reasonably equivalent value or was insolvent at the time of the transfers. The Court will first address Jeanne's arguments on actual fraud and then address her arguments on constructive fraud. The bankruptcy court's fraudulent transfer determination can be affirmed on either actual or constructive fraud.

1.   Actual Fraud

Courts may use circumstantial evidence to find actual intent to hinder, delay, or

---

[2] This portion of the opinion does not address the three entities that the bankruptcy court improperly determined were McCallan's alter egos.

defraud. *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998).  The court uses the badges of fraud to assess fraudulent intent, which examine whether

> (1) The transfer was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer;  (3) The transfer was disclosed or concealed; (4) Before the transfer was made the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* at 1272.

The bankruptcy court found that the conveyances were made with actual intent to hinder, delay, and defraud creditors.  The court considered McCallan's efforts to conceal his assets, such as purchasing gold coins, keeping unaccounted funds in a safe, and failing to fully report funds held in offshore accounts.  The court also considered Jeanne's failure to provide documents verifying her employer–employee relationship with the non-party entities as evidence that McCallan did not receive reasonably equivalent value for the transfers.  The court considered the complexity of the transactions and their difficulty to trace as evidence that the transfers were concealed.

Additionally, the transfers were made to a clear insider—McCallan's wife.  Many of these transfers occurred while McCallan was threatened with suit and liability: Carroll testified that McCallan was insolvent when these transfers took place due to the impending judgment against him.  Accordingly, the evidence supports many of the badges of fraud. There was sufficient evidence to support the bankruptcy court's findings that the transfers were made with the intent to hinder, delay, and defraud creditors.  The court's finding of actual fraud is due to be affirmed.

2.      Constructive Fraud

Additionally, the bankruptcy court found that the transfers constituted constructive fraud because McCallan was insolvent at the time the transfers were made and he did not receive reasonably equivalent value for them.  The bankruptcy court found that McCallan was insolvent as early as January 1, 2007.  Carroll's expert testimony supported this conclusion.  Using the balance sheet analysis for insolvency, Carroll considered the judgment against McCallan as a liability.  Carroll also calculated McCallan's assets, which he testified was difficult due to the complex nature of McCallan's financial affairs.  Even giving McCallan a wide berth for undisclosed assets, Carroll testified that McCallan's assets did not even remotely reach McCallan's liabilities.  There was sufficient evidence to support the court's finding of insolvency.

The bankruptcy court also determined that McCallan did not receive reasonably equivalent value for the transfers because Jeanne did not provide any consideration.  In doing so, the bankruptcy court made a credibility determination.  The court found that Jeanne's testimony that she performed labor was self-serving and not credible.  Instead, the court

credited the fact that Jeanne did not report these purported wages on her tax returns or provide records of her hours worked.

The bankruptcy court made a similar determination for the transfers that were not purported wages.  There, the court found that the evidence did not support Jeanne's claim that she provided consideration for the remaining transfers.  Accordingly, the bankruptcy court did not err in finding constructive fraud because there was sufficient evidence that McCallan was insolvent at the time of the transfers and did not receive reasonably equivalent value for the conveyances.  The bankruptcy court's ruling on this matter is due to be affirmed.

### D. Evidentiary Submissions

Jeanne also argues that she is entitled to a new trial because the bankruptcy judge admitted Wilkins' exhibits that were submitted one day after the date provided in the court's scheduling order.  While Jeanne raised this argument in her initial brief, she did not address it in her reply the Wilkins' response.

The bankruptcy court admitted Wilkins' exhibits after she explained that internet issues caused the untimely submissions.  The bankruptcy court allowed the late-filed exhibits to relate back to Wilkins' timely filed exhibits.  The bankruptcy court's scheduling order allowed an exception to its evidentiary submission deadline for good cause shown. The bankruptcy court did not abuse its discretion by admitting the exhibits one day after that deadline, and the decision to admit the exhibits in question is due to be affirmed.

### V. CONCLUSION

For the foregoing reasons, the bankruptcy court's rulings are AFFIRMED IN PART and VACATED IN PART.  This matter is REMANDED for further proceedings consistent

with this decision.   The bankruptcy court is ORDERED to reconsider the fraudulent

conveyance analyses for the Alpha Mar, Island Punch, and Island Vibes conveyances in

accordance with this ruling.

DONE this 13th day of March, 2023.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE